## ATTACHMENT A

## STATEMENT OF FACTS

This Joint Statement of Facts is incorporated by reference as part of the Plea Agreement between the defendant, ESI Energy, LLC (hereinafter "ESI" or "defendant"), and the United States Department of Justice, by and through the United States Attorney for the District of Wyoming and the Environmental Crimes Section of the Environment and Natural Resources Division (together, the "Department" or the "government"). The parties stipulate that the following information is true and accurate to the best of their knowledge. ESI admits, accepts, and acknowledges that it is responsible for the acts and omissions of its officers, directors, employees, and agents as set forth below. If this matter were to proceed to trial, the Department would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below:

I.  **Background**

A.  ESI is a Delaware limited liability company and a wholly owned subsidiary of NextEra Energy Resources, LLC. Defendant owns various other limited liability companies, many of which operate wind energy generation facilities in the United States. Among those entities are Cedar Springs Transmission, LLC, which developed and operates parts of the Cedar Springs Wind Energy Facility (hereinafter "Cedar Springs") in Wyoming; Roundhouse Renewable Energy, LLC, which developed and operates the Roundhouse Wind Energy Facility (hereinafter "Roundhouse") in Wyoming; and FPL Energy New Mexico Wind, LLC, which developed and operates the New Mexico Wind Energy Facility (hereinafter "New Mexico Wind") in New Mexico.

B.  The risks to bald and golden eagles ("eagles") from wind turbines have been recognized since at least the early 2000s. Wind power facilities can cause the deaths of eagles primarily through collisions between eagles and wind turbine *rotor blades*.

1

C. The Migratory Bird Treaty Act ("MBTA") provides a Class B misdemeanor penalty for unpermitted takings of migratory birds. 16 U.S.C. §§ 703, 707. "Take" means "to pursue, hunt, shoot, wound, kill, trap, capture, or collect" or to attempt to do so. 50 C.F.R. § 10.12. A list of bird species protected by the MBTA, including passerines, waterfowl, raptors (including golden and bald eagles), and shorebirds, is found at 50 C.F.R. § 10.13. The Tenth Circuit has upheld criminal liability under the MBTA for proximately causing the death of migratory birds. *See, e.g., United States v. Apollo Energies*, 611 F.3d 679, 684-691 (10th Cir. 2010).

D. Golden and bald eagles are not listed as threatened or endangered under U.S. law. However, they are among many species protected by the MBTA, and are more specifically protected under the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668c (hereinafter "the Eagle Act"). The Eagle Act provides a Class A misdemeanor penalty for the first offense of taking a bald or golden eagle knowingly, or with wanton disregard for the consequences of an act. Second and subsequent violations are Class E felonies.

E. The U.S. Fish and Wildlife Service ("USFWS") is the agency tasked with enforcing and implementing the MBTA and the Eagle Act. There is currently no specific means or mechanism to acquire a programmatic permit to "take" an eagle under the MBTA. However, there is a specific regulatory mechanism to acquire a programmatic permit to "take" an eagle under the Eagle Act ("eagle take permit" or "ETP"), as further described below. Neither the MBTA nor the Eagle Act requires permits prior to undertaking an action such as operating a wind power facility. Rather, each prohibits the taking of an eagle without such a permit.

F. The USFWS issued its first interim guidance on how wind project developers could avoid and minimize impacts to wildlife from wind turbines in 2003 (2003 Interim

2

Guidance on Avoiding and Minimizing Impacts from Wind Turbines; "2003 Interim Guidelines"). It issued a more fully informed, but largely similar, set of guidelines in the 2012 Land-Based Wind Energy Guidelines ("2012 LBWEGs"), developed with the wind industry, including a senior representative of ESI affiliates, on March 23, 2012.

G. Due diligence during the pre-construction stage -- as described in the 2003 Interim Guidelines and tiers one through three in the 2012 LBWEGs -- includes surveying the wildlife present in the proposed wind energy project area, determining whether the risk to wildlife is too high to justify proceeding and, if not, carefully siting turbines so as to avoid and minimize the risk. This is important for wind projects because post-construction remedies for impacts to eagles that are not avoided during the pre-construction design stage are limited.

H. In 2009, following "delisting" of the bald eagle under the Endangered Species Act, USFWS enacted regulations to allow issuance of permits pursuant to the Eagle Act for the non-purposeful take of bald and golden eagles. These regulations, as revised in December 2016, set forth the process by which the operator of a facility can apply for -- for purposes of the Eagle Act -- a permit for eagle take that is associated with, but not the purpose of, an activity. 50 C.F.R. § 22.80(a). In 2011, USFWS issued draft guidance on development of an eagle conservation plan to obtain an ETP for a wind facility. That guidance was finalized in April 2013.

I. Counts One through Three of the Information each charge a violation of the MBTA's "take" prohibition, all of which involve eagle fatalities within the Tenth Circuit.

II. **Defendant's Development Of, and Eagle Fatalities At, the Cedar Springs Wind Energy Facility**

A. Between 2018 and 2019, ESI authorized subsidiaries Cedar Springs

Transmission, LLC ("CST") and Cedar Springs Wind III, LLC ("CSW"), to develop a multi-project commercial wind power facility in Converse County, Wyoming, that is, Cedar Springs, consisting of the Cedar Springs I, Cedar Springs II, and Cedar Springs III wind power facilities. The facilities, sited on private land, eventually comprised 177 2.3-megawatt and 2.8-megawatt wind turbines.

      B.      As is common during the development process for commercial wind projects, CST and CSW hired a consultant to evaluate use of the site by wildlife, including eagles, and determine the expected impact on such wildlife from the facility. The consultant conducted 15 surveys between 2015 and 2019. The consultant advised CST and CSW that golden eagles were observed in the project area and it was likely that there would be eagle mortalities caused by the operation of wind turbines at each of the Cedar Springs facilities.

      C.      On August 23, 2018, the President and multiple Vice Presidents of ESI were among a group that considered a proposal to develop the Cedar Springs projects in Wyoming. During the meeting, the group received information that the Cedar Springs project vicinity had a large local population of golden eagles, and that modeling concluded that there was a statistical potential for up to 11 golden eagle and six bald eagle mortalities per year from the operation of wind turbines. In September 2018 the group, including ESI officers, approved the development of the Cedar Springs projects.

      D.      On January 17, 2019, CSW applied to the Wyoming Industrial Siting Council (hereinafter "WISC" or "Council") for a permit authorizing the construction of Cedar Springs III.

      E.      Between February 2, 2019, and February 20, 2019, CST, CSW and their consultant provided USFWS with survey data from 2016 and 2017. On March 28, 2019, USFWS recommended that additional eagle nest and eagle-use surveys be conducted, and that the data be provided to USFWS. USFWS also informed defendant, through a letter to its

agents, that the Cedar Springs I and II projects, based on the consultant's calculations, could result in the collision mortality of 44 golden eagles and 23 bald eagles over the first five years of operations, and recommended that the company should apply for an ETP under the Eagle Act as soon as possible. USFWS further recommended that, because of the unusually high number of occupied golden eagle nests, the proposed wind project not be built.

  F. On February 24, 2019, defendant, through CST, applied to WISC for a permit authorizing the construction of Cedar Springs I and II. As part of the applications to WISC, CST and CSW submitted one Monitoring Plan for Cedar Springs I and II, and one Monitoring Plan for Cedar Springs III. In the Monitoring Plans, CST and CSW agreed that, among other things, wind turbines would be located at least 1.5 miles from any known bald and golden eagle nests; all construction would occur outside seasonal disturbance-free buffers for bald and golden eagles, based on recommendations from the Wyoming Game and Fish Department; the wind turbines would not include any lattice supports or external ladders or platforms in order to minimize bird perching and nesting; and electricity lines would be buried underground.

  G. On June 28, 2019, WISC granted the application for Cedar Springs I and II. On October 31, 2019, WISC granted the application for Cedar Springs III. WISC concluded that, in its applications, CST and CSW had proved that the projects would not pose a threat of serious injury to the environment. Defendant continued the development of the Cedar Springs projects.

  H. On July 17, 2019, representatives of CST and CSW met with USFWS representatives to discuss the survey data, specifically eagle and other large bird nest data from 2017 to 2019, as well as eagle-use survey data collected between December 2016 and April 2019. During that meeting, USFWS noted that the project is a high risk site and eagles will be taken and that take of eagles without a permit is illegal.

  I. Between September 10, 2019, and September 23, 2019, USFWS wrote

additional letters to the defendant's agents, following up on the July meeting, each noting that the defendant's parent company had documented that the project was anticipated to kill eagles and recommending that the facilities apply for an ETP. USFWS reiterated in each letter its recommendation that a wind project not be constructed in the proposed area for Cedar Springs. In the September 10, 2019, letter, USFWS also recommended that, if the wind project were built, the Cedar Springs I facility should implement seasonal curtailment during daylight hours. USFWS further recommended that, if the facilities were nevertheless constructed, turbines not be located within the one-half mean inter-nest distance of golden eagle nests, a recommendation with which CST and CSW complied. At least two officers of ESI were aware of the communications in 2019 with USFWS about risks to eagles in the area of the Cedar Springs projects.

  J. On or about September 28, 2020, defendant's affiliates began some turbine operations at Cedar Springs II. Between approximately November 29, 2020, and December 1, 2020, two golden eagle carcasses were found near wind turbines at Cedar Springs II. The Cedar Springs II facility was sold to another wind energy company on December 1, 2020.

  K. On or about December 6, 2020, defendant authorized the commercial operation of Cedar Springs I to commence. Between April 2021 and January 2022, as required under the WISC permit, the project reported to USFWS the discovery of seven golden eagle carcasses found near wind turbines at Cedar Springs I.

  L. On or about December 15, 2020, defendant authorized the commercial operation of Cedar Springs III to commence. On approximately January 30, 2022, one golden eagle carcass was found near a wind turbine at Cedar Springs III.

  M. No ETP was sought by or issued to ESI or its affiliates in connection with the operations of the Cedar Springs project.

6

### III. Defendant's Development Of, and Eagle Fatalities At, the Roundhouse Wind Energy Facility

A.     Between 2018 and 2019, ESI authorized a subsidiary, Roundhouse Renewable Energy, LLC ("RRE"), to develop a commercial wind power facility in Laramie County, Wyoming, that is, Roundhouse. The facility, sited on private land, eventually comprised 82 2.3-megawatt and 2.8-megawatt wind turbines.

B.     On April 25, 2018, the President and multiple Vice Presidents of ESI were among a group which considered a proposal to develop Roundhouse. During the meeting, the group received information that the project was located in a golden eagle habitat area and was predicted to result in eagle mortalities from the operation of the wind turbines. The development of Roundhouse was approved by the group, including ESI officers.

C.     A consultant was retained to evaluate use of the Roundhouse site by wildlife, including birds, and determine the expected impact on such wildlife from the facility. Fourteen surveys were conducted between 2015 and 2019. Some were conducted by a prior company that had been developing a portion of the project area before it was acquired by defendant in late 2018, and some were conducted by the consultant on behalf of RRE. The consultant advised RRE that golden eagles were observed in the project area and that it was likely that some eagle mortalities would be caused by wind turbine operations.

D.     On March 18, 2019, RRE applied to WISC for a permit authorizing the construction of Roundhouse. As part of its application, RRE submitted a Monitoring Plan, in which it agreed that, among other things, turbines would be located at least 0.5 miles from any known bald and golden eagle nests; all construction would occur outside seasonal disturbance-free buffers for bald and golden eagles based on recommendations from the Wyoming Game and Fish Department; the wind turbines would not include any lattice supports or external ladders or platforms in order to minimize bird perching and nesting; and wind turbines would

7

be located away from known food sources for eagles. It is RRE's position that it complied with all of these requirements. The size of the initial phase of the project was scaled down from over 100 wind turbines to 82 turbines, for economic reasons.

E.  During 2019, representatives of RRE met with USFWS representatives to discuss survey data and other issues. On March 28, 2019, agents of ESI received from USFWS a letter regarding the proposed Roundhouse project, stating that, based on RRE's consultant's calculations, the project could result in the collision mortality of 19 golden eagles and 4 bald eagles over the first five years of operation, and recommending that the company apply for an ETP under the Eagle Act.

F.  On August 13, 2019, WISC granted RRE's application for a permit to construct the project. WISC concluded that, in its application, RRE had proved that the project would not pose a threat of serious injury to the environment. Defendant continued the development of Roundhouse.

G.  Between February 10, 2019, and February 19, 2019, RRE and its consultant provided to USFWS eagle-use and eagle nest survey data from 2016 and 2017 collected by the prior project owner. On July 3, 2019, RRE and its consultant provided to USFWS eagle-use and eagle nest survey data from 2018 and 2019. Some of the data were not collected following standard methodologies across the full project area, and the remaining data would not be completed until September 2019. Nevertheless, in a letter dated August 27, 2019, USFWS provided recommendations on opportunities to avoid and minimize impacts to eagles and other migratory birds using the available data. Although RRE followed recommendations relating to the siting of 20 wind turbines (it did not follow one other recommendation), USFWS again stated that the project was predicted to take eagles even if all USFWS recommendations were implemented, and recommended that an ETP be sought. At least two officers of ESI were aware of the communications in 2019 with USFWS about risks to eagles from Roundhouse.

8

      H.      On June 12, 2020, defendant authorized the commercial operation of Roundhouse to commence. No ETP was sought or issued in connection with the operations of Roundhouse.

      I.      On or about each of September 17, October 5, November 17, 2020, and April 17, 2021, RRE reported to USFWS, as required under its WISC permit, the discovery of a golden eagle carcass near a wind turbine at Roundhouse.

## IV. Defendant's Development Of, and Eagle Fatalities At, the New Mexico Wind Energy Facility

      A.      In 2003, ESI authorized a subsidiary, FPL Energy New Mexico Wind, LLC ("NMW"), to begin operations at a commercial wind power facility in De Baca and Quay Counties, New Mexico, that is, New Mexico Wind. The facility, sited on private land, currently is comprised of 136 wind turbines, with a capacity of 203 megawatts.

      B.      Between 2004 and 2005, representatives of NMW met with USFWS to discuss the presence of eagle nests in the vicinity of turbines at New Mexico Wind. On October 14, 2005, NMW suggested that eagle mortality could be minimized by providing alternative nest sites away from the turbines, to which USFWS agreed. This work was completed on December 2, 2005, with the full cooperation of USFWS.

      C.      In 2007, the representatives of NMW submitted a request for a permit from USFWS to move an active nest away from a turbine. This application was approved by USFWS. The relocation of the nest was completed on January 28, 2007. Accordingly, representatives of NMW were aware that there was a risk to eagles in the vicinity of the New Mexico Wind facility.

      D.      In 2017, the repowering of the turbines at New Mexico Wind, consisting primarily of installing larger turbine blades, was authorized by a group which included officers of ESI. No ETP was sought or issued in connection with the operations or repowering of New

Mexico Wind.

E.  On or about December 29, 2020, NMW voluntarily reported to USFWS the discovery of two golden eagle carcasses near a wind turbine at the New Mexico Wind facility.

## V. The Development Of, and Eagle Fatalities At, ESI's Other Wind Energy Facilities

A.  Defendant ESI, through various subsidiaries, currently operates approximately 154 wind energy generation projects in the United States. Some projects have been operating for many years, others became operational only recently. Defendant and its affiliates have undertaken various measures at a number of its projects to reduce the risk of eagle deaths and injuries, including carrion removal, design improvements to reduce perching and nesting, micro-siting of turbines to locate them away from known nests or eagle food sources, monitoring, and the testing and deployment at one facility of a system designed to identify eagles and automatically curtail turbines. At some locations, compensatory mitigation measures have been taken, including the funding of studies and the purchase of habitat for eagles.

B.  Golden and/or bald eagles are found in all states except Hawaii. Many of the facilities operated by defendant's subsidiaries have experienced no eagle fatalities. However, approximately 150 eagles have died since 2012 at 50 of defendant's wind power facilities. Defendant's affiliates reported all eagle fatalities it discovered to USFWS. The government has agreed, for the purposes of this Plea Agreement, not to require restitution for 13 of these eagle fatalities that occurred between March 8, 2021, and December 3, 2021, when a federal regulation was in effect that excluded incidental takings and killings from the scope of the MBTA. The government further stipulates to the exclusion, for the purposes of this Plea Agreement, of an additional 14 eagles, since no laboratory has determined a cause of death for any of these eagles. The remaining 123 eagle deaths were documented by USFWS at defendant's various facilities in California (92 eagles); North Dakota (13 eagles), Wyoming (8

10

eagles); Colorado (3 eagles); Michigan (3 eagles); New Mexico (2 eagles); Arizona (1 eagle); and Illinois (1 eagle).

    C.    ESI adopted a nationwide posture of not applying for eagle take permits; at no time did ESI or any of its subsidiaries or affiliated companies or their personnel or agents apply for or obtain any eagle take permit authorizing the killing or wounding of any eagles relating to any of its wind power facilities.

    D.    The Altamont Pass Wind Resource Area ("APWRA") is located mostly in Alameda County, California. In the 1990s, numerous wind facilities were installed at the APWRA by a number of wind facility operators. Soon thereafter it was widely documented that turbines at these facilities were associated with fatalities of and injuries to golden eagles. Vasco, Golden Hills, and Golden Hills North (ESI-controlled wind facilities) are located in the APWRA.

    E.    With respect to risks to eagles associated with these three wind energy facilities located in the APWRA, the subsidiaries of ESI operating the facilities entered into a comprehensive agreement with the State of California and several environmental organizations in December 2010 ("the Agreement"). The Agreement provided, among other things, that the entities would conduct planned repowering of wind facilities, originally built by other companies, on an accelerated schedule that was hoped to reduce eagle fatalities in the APWRA and would be deemed to bring the ESI subsidiaries into compliance with an earlier Settlement Agreement. Under the Agreement, the entities also agreed to pay a per-megawatt mitigation fee for ongoing harm to raptors, including golden eagles, at these three facilities. The parties agreed that the fee would count toward any future local, state, or federal compensatory mitigation requirements. In return, the State of California and the environmental organizations

agreed to a covenant not to sue.

F. Although USFWS was aware of the Agreement and participated in meetings relating to it, no federal entity was a party to the Agreement, nor did the Agreement require any applications for any ETPs despite the anticipated takes of eagles. Certain recommendations made for the minimization of eagle mortalities from the operation of turbine rotor blades at the facilities in California were not followed by ESI, its affiliates or its subsidiaries. No ETP was sought or issued in connection with the operations or repowering of any of the facilities covered by the Agreement.

G. Of the 123 eagle fatalities referenced above between 2012 and the end of 2021, 82 occurred at the defendant's Vasco, Golden Hills and Golden Hills North facilities. Pursuant to the Agreement, the ESI-related entities paid a total of $2,206.260 between 2011 and 2017, which funds were administered by a regional park district and used to fund studies and surveys of golden eagles in the Altamont area by the U.S. Geological Survey, to purchase habitat to support golden eagle populations, and for other related purposes.

**VI. Conclusion**

A. The facts described herein establish that eagles died or were injured by colliding with wind turbine rotor blades at the Cedar Springs I and II, Roundhouse, and New Mexico Wind facilities, and that such facilities had a statistical probability of occurring which was known to defendant. The government would be able to prove these, and all the stipulated facts above beyond a reasonable doubt with admissible evidence.

B. The Department has exercised its discretion to enter into this Plea Agreement and charge defendant with three misdemeanor violations of the MBTA rather than felony violations of the Eagle Act, due to defendant's agreement to the Eagle Management Plan,

ESI's willingness to acknowledge the facts contained herein and enter into the Plea Agreement (including ESI's willingness to commit to apply for voluntary eagle incidental take permits at 50 of its wind facilities nationwide), defendant's prior efforts to minimize and mitigate for past and future eagle fatalities at its wind power facilities in Wyoming and elsewhere, and the government's belief that the resource is better served through entering into this Plea Agreement than through protracted litigation. The Department believes, based on interactions with ESI counsel and management in recent months, and the facts discussed herein, that defendant has undergone a beneficial change in its approach to safeguarding public wildlife resources in the development and operation of its wind facilities.