**ATTACHMENT B**

**EAGLE MANAGEMENT PLAN**

This Eagle Management Plan ("EMP") is entered into between ESI Energy, LLC (the "defendant") and the United States Department of Justice, by and through the United States Attorney for the District of Wyoming and the Environmental Crimes Section of the Environment and Natural Resources Division (hereinafter "the Department" or "the government"), as an element of the Plea Agreement ("Agreement").

**Land-Based Wind Energy Guidelines**

1.      With respect to each of the 50 wind energy facilities listed below in paragraphs 3, 9, and 11 ("Listed Facilities"), the defendant will follow the 2012 United States Fish and Wildlife ("USFWS") Land-Based Wind Energy Guidelines ("LBWEGs") and the 2013 USFWS Eagle Conservation Plan ("ECP") Guidance where it remains applicable, in consultation with the respective Regions.

2.      It is understood by the government and the defendant (collectively referred to as "the Parties") that some of the defendant's facilities were developed and constructed and became operational prior to the finalization of the LBWEGs so information and data for Tiers 1–4 may be incomplete and not in full adherence with the LBWEGs. Other facilities were developed and/or constructed in a manner not fully consistent with the LBWEGs. However, some data elements of Tiers 1-5 of the LBWEGs have been collected and shall be submitted to the USFWS for use in implementing this EMP and issuing eagle take permits ("ETPs"), as further described below.

**Initial Data Sharing and ETP Application Preparation**

*Phase I Facilities – Data Sharing and Initial Meeting*

3.      The following 17 facilities will be prioritized for minimization and permitting work ("Phase I facilities"):

Region 2

New Mexico Wind

Region 3

Buffalo Ridge

Heartland Divide II

Pheasant Run I

Tuscola Bay I

Tuscola Bay II

Region 5

Eight Point

Region 6

Cedar Springs I

Cedar Springs III

Clearwater I

Irish Creek

Roundhouse I

Region 8

Golden Hills

Golden Hills North

North Sky River

Sky River

Vasco Wind

4.      No later than 30 days after imposition of sentence pursuant to the Agreement, the Parties will meet and determine which of the Phase I facilities will proceed using "priors only"

2

modeling. Those facilities will be designated as Phase IA facilities. Those that will not be using priors only modeling will be designated as Phase IB facilities.

5.      No later than 30 days after execution of the Agreement, the defendant will provide to the USFWS its site assessments (including risk assessments) and turbine siting plans for Buffalo Ridge, Heartland Divide II, Eight Point, and Clearwater, each of which are not yet operational but are due to become operational in 2022.

6.      No later than 60 days after execution of the Agreement for Phase IA facilities, and no later than 90 days after execution of the Agreement for Phase IB facilities, the defendant will submit to the relevant Regional Offices of the USFWS all existing eagle monitoring and survey data, all existing eagle mortality data, all existing and anticipated eagle monitoring requirements or processes (including the results of its Tier 1–4 monitoring and assessments under the LBWEGs, when applicable, including survey and monitoring results, risk assessments, and turbine siting plans), and all ongoing eagle minimization efforts. However, if the defendant elects to proceed with the ETP application process applying "priors-only" modeling, then the submission of monitoring and survey data as to such facilities is not required, except that all mortality data for any Listed Facility being considered for the installation of IdentiFlight or similar informed curtailment system, including the facilities listed in paragraph 16 below, are still required, as are turbine specifications and location data for all Phase I facilities.[1]

7.      No later than 90 days after execution of the Agreement, the defendant and USFWS will meet to discuss, for each Phase IA facility in Regions 6 and 8, interim eagle monitoring, the preparation of an ETP application (including what existing monitoring and survey data and other information should be submitted and by when), possible eagle minimization actions, and any needed adjustment to the permit application submission date set forth below. No later than 120 days after execution of the Agreement, the defendant and USFWS will meet to have the same

---

[1] Informed curtailment is curtailment that is informed by observations of eagles in the proximity of turbines, either via an automated detection technology or trained observers.

discussions regarding each Phase IA facility in Regions 2, 3, and 5. Such meetings may be conducted virtually.

8.      No later than 150 days after execution of the Agreement, the defendant and USFWS will meet to discuss, for each Phase IB facility, interim eagle monitoring, the preparation of an ETP application, possible eagle minimization actions, and any needed adjustment to the permit application submission date set forth below. These meetings will be conducted on a USFWS Regional level. Such meetings may be conducted virtually.

*Phase II Facilities – Data Sharing and Initial Meeting*

9.      No later than ten months after execution of the Agreement, the defendant will submit to USFWS all existing eagle monitoring and survey data, all existing eagle mortality data, all existing and anticipated eagle monitoring requirements or processes (including the results of its Tier 1–4 monitoring and assessments, when applicable, if any, including any survey and monitoring results, risk assessments, and turbine siting plans), and all ongoing eagle minimization efforts at the following 11 facilities ("Phase II facilities"). However, if the defendant elects to proceed with the ETP application process applying "priors-only" modeling, then the submission of monitoring and survey data as to such facilities is not required, although turbine specifications and location data are still required.

<u>Region 1</u>
Wheatridge II

<u>Region 2</u>
Hubbard
Skeleton Creek
White Hills

<u>Region 3</u>
Crystal Lake I
Crystal Lake II

Crystal Lake III

Jordan Creek

Region 6

Bronco Plains

Emmons Logan

Soldier Creek

10.     No later than 15 months after imposition of sentence pursuant to the Agreement, the defendant and USFWS will meet to discuss, for each Phase II facility, interim eagle monitoring, the preparation of an ETP application, possible eagle minimization actions, and any needed amendment to the permit application submission date set forth below. These meetings will be conducted on a USFWS Regional level. Such meetings may be conducted virtually.

*Phase III Facilities – Data Sharing and Initial Meeting*

11.     No later than 24 months after imposition of sentence pursuant to the Agreement, the defendant will submit to USFWS all existing eagle monitoring and survey data, all existing eagle mortality data, all existing and anticipated eagle monitoring requirements or processes (including the results of its Tier 1–4 monitoring and assessments, when applicable, including survey and monitoring results, risk assessments, and turbine siting plans), and all ongoing eagle minimization efforts at the twenty-two facilities listed below ("Phase III facilities"). However, if the defendant elects to proceed with the ETP application process applying "priors-only" modeling, then the submission of monitoring and survey data as to such facilities is not required, although turbine specifications and location data are still required.

Region 1

Stateline

Region 2

Blackwell

5

Borderlands

Casa Mesa

Rush Springs

Torrecillas

Region 3

Lee/DeKalb

Region 6

Ashtabula

Ashtabula II

Brady I

Golden West

Langdon I

Langdon II

Limon Wind I

Limon Wind II

Oliver I

Peetz I

Pratt

Wilton

Region 8

Green Power

High Winds

Montezuma

12.    No later than 30 months after imposition of sentence pursuant to the Agreement, the defendant and USFWS will meet to discuss, for each Phase III facility, any interim eagle monitoring, the preparation of an ETP application, possible eagle minimization actions, and any

6

needed amendment to the permit application submission date set forth below. These meetings will be conducted on a USFWS Regional level. Such meetings may be conducted virtually.

13.     During each meeting described in paragraphs 7, 8, 10 and 12 above, USFWS will identify the eagle monitoring and other data that must be submitted as specifically required under the ETP rule, and included in the ETP application. A mortality monitoring plan will be deemed sufficient if it has an average annual probability of finding a dead eagle of 0.35 or greater ("0.35 mortality monitoring"). Additional monitoring beyond that required for or by an ETP will not be required, but facility personnel who observe, or are the first personnel at the project to be told of, eagle fatalities or injuries will report those pursuant to paragraph 23. Early implementation of mortality monitoring by the defendant that would be required pursuant to an ETP, but which is undertaken prior to the issuance of the ETP, will be treated by USFWS as if undertaken after the issuance of the ETP.

14.     The defendant will apply for, and diligently pursue, ETPs on the following schedule:
         (a) Phase IA Facilities – within six months of the imposition of sentence.
         (b) Phase IB Facilities – within 12 months of the imposition of sentence.
         (c) Phase II Facilities – within 24 months of the imposition of sentence.
         (d) Phase III Facilities – within 36 months of the imposition of sentence, or, for eligible facilities as to which the defendant elects to proceed under a new process for low-risk facilities, within 12 months of the issuance of any final regulation creating a permitting process for low risk facilities.
This schedule may be amended, in writing, to the extent (if at all) mutually agreed by USFWS and the defendant.

**Interim Minimization**

15.     Based on the data collected or submitted pursuant to each meeting described in paragraph 7, 8, 10, and 12 above, the USFWS, after consultation with the defendant, will identify avoidance and minimization measures to reduce mortalities and injuries to the maximum degree practicable relative to the magnitude of the impacts to eagles for Listed Facilities. Practicable is

7

defined for the purposes of this EMP as set forth in 50 C.F.R. § 22.6. The defendant will implement in good faith such practicable measures as are identified by USFWS, in a timely fashion and in the order of priority established by USFWS, subject to: (1) any legal constraints, including but not limited to private landowner rights; and/or (2) the Cost Cap, defined in paragraph 18 below.

16.     The defendant, the Department, and USFWS will meet every six months for the duration of the probationary period to review documented eagle fatalities occurring at any wind project operated by the defendant or one of its affiliates within the prior six months. USFWS and the defendant will mutually agree to a date for the first such meeting, which shall be held no later than 240 days after sentencing pursuant to the Agreement. At the first such meeting, the defendant will provide to USFWS an assessment of anticipated minimization that could result from installing IdentiFlight or similar informed curtailment technology at each of the following facilities: Golden Hills, Golden Hills North, Roundhouse I, Cedar Springs I, and Irish Creek. The second such meeting, and each even numbered meeting thereafter, will be the Annual Mitigation Meeting, as further discussed in Paragraph 25 below, the first of which shall be held no later than 100 days after the first anniversary of sentencing. Thereafter, if no mortality or injury is documented during any six-month period not culminating in an Annual Mitigation Meeting, that six-month meeting is not required.

17.     The defendant will implement the following measures at each of the Listed Facilities:

        A.     Within 30 days of imposition of sentence pursuant to the Agreement, to the
        extent not already done, the defendant will, subject to and with the permission of the
        property owner where required, and subject to receipt of any other required approvals,
        initiate prompt removal or burying of carrion (livestock or wildlife) from the sites
        upon discovery to remove the potential attraction to eagles and other carrion-eating
        avifauna.

        B.     No later than 30 days after imposition of sentence pursuant to the
        Agreement, the defendant will submit to USFWS Region 8 all data it wishes

USFWS to consider with regard to potential daytime curtailments at each of the following turbines, each of which was the nearest turbine to multiple dead eagles:

Golden Hills – Turbines 1, 12, 14, 15, 25, 30, and 34
Golden Hills North – Turbines 59, 62, and 65
North Sky River – Turbines 43 and 49
Vasco – Turbines 5 and 11

The defendant will have a reasonable opportunity to meet with USFWS within 21 days after USFWS receives the data, to discuss the scope of potential curtailments, if any, at these turbines. Within 14 days of receiving notice from USFWS describing the curtailments needed at any or all of these turbines, the defendant will implement the curtailments.

C.      Within 12 months of the imposition of sentence pursuant to the Agreement, to the extent not already done, the defendant will conduct surveys, assessments, and, subject to and with the permission of the property owner and subject to any other required approvals, remove or modify manmade habitat features that may harbor hares, rabbits (rock piles, debris piles, etc.) or other burrowing prey at each of the Listed Facilities.

18.     Minimization Measures Cost Cap. The Parties, recognizing that actual costs may vary from year to year based on advances in science and technology and the specific measures implemented during the term of the EMP, agree that the defendant, either directly or through its affiliates, will not be required to spend more than $27 million over the five years of probation, and no more than $7 million in either of the first two years of probation, and no more than $9 million in years three to five of probation, to implement the interim minimization measures across the Listed Facilities (the "Cost Cap"). Costs counted toward this Cost Cap are expenditures at the Listed Facilities required for minimization efforts identified above and pursuant to this EMP, including but not limited to research, contractors, equipment, lost revenues due to curtailments (except as provided otherwise in paragraph 19 below), and IdentiFlight or

9

similar informed curtailment system installation and operation. Costs counted toward this Cost Cap do not include the costs associated with: (1) compensatory mitigation (set forth below); (2) implementation of ESI's Wildlife Response and Reporting System; (3) continuation of existing minimization and/or monitoring measures to the extent they continue to be required under existing local or state permits or other agreements; (4) participation in required meetings; and, (5) costs to develop, apply for, obtain and implement ETPs (including voluntary early monitoring as described in paragraph 13). If this EMP is extended beyond five years, as provided for in the Agreement, a separate Cost Cap for that period of extension will be calculated by multiplying the number of years of the extension granted, by $200,000 for each Phase I facility, $100,000 for each Phase II facility, and $75,000 for each Phase III facility, as to which no final action on an ETP application has been taken as of the start of the period of extension. The resulting cost cap will be divided equally among the years of the agreed upon extension.

19.     Lost Generation Revenue. Lost revenue from turbine curtailments under this EMP will count towards the Cost Cap. However, lost generation revenues due to curtailment of the turbines conducted pursuant to any current or future state or local requirements or other legal agreements (other than this Agreement), including curtailments pursuant to IdentiFlight units currently installed at Golden Hills, will not count toward the Cost Cap.

**Interim Monitoring**

20.     During the period of probation, and if requested by USFWS, during any extended period of non-prosecution if requested by USFWS, the defendant will continue to monitor and analyze the effectiveness of IdentiFlight installed at Golden Hills in the fall of 2019.

21.     Nothing in this EMP or the Agreement has any effect on monitoring required pursuant to state or local permits or other independent obligations for any Listed Facility.

22.     If requested by USFWS, the defendant will conduct 0.35 mortality monitoring for up to two years at the Listed Facilities identified in paragraph 16, and up to four additional Listed

10

Facilities as may be identified by USFWS, as candidate sites for the installation of IdentiFlight or similar informed curtailment system. Such monitoring will be treated by USFWS as if undertaken after the issuance of the ETP (see paragraph 13 above) and thus will not be included in the Cost Cap.

23.     The defendant, directly or through its affiliates, will notify the USFWS, via email, phone or in person, as soon as possible but no later than 36 hours after discovery of an eagle fatality in proximity to a turbine at any Listed Facility.

**Eagle Take Permits**

24.     The defendant, either directly or through its affiliates, will apply for and diligently pursue ETPs for each of the Listed Facilities. Diligent pursuit will be demonstrated by following the requirements set forth above. Development of the ETP applications will follow all applicable guidance to the extent practicable, and regulations in effect on the date thereof, and be done in coordination with experts within the USFWS as available.

**Compensatory Mitigation**

25.     At each Annual Mitigation Meeting held pursuant to paragraph 16, USFWS will determine the number of eagles that have died as a result of collisions with wind turbines at the Listed Facilities during the prior Mitigation Year. (The probationary period shall consist of five consecutive, 12-month "Mitigation Years," with the first Mitigation Year being the 12-month period commencing on the sentencing date and ending on the first anniversary of the sentencing date. Mitigation Years shall also include, with respect to any Listed Facility subject to an extended period of non-prosecution in accordance with the Agreement, each consecutive 12-month period commencing on the date immediately following the last day of the probationary period through termination. If the extended period for any Listed Facility does not align with a Mitigation Year, the mitigation required during the extended period shall be pro-rated equitably.)

11

a.      For any Phase I, Phase II and Phase III facilities that had implemented 0.35
mortality monitoring for at least two full years prior to any Annual Mitigation Meeting,
the number of fatalities to be mitigated (compensatory mitigation) will be determined
based on estimates derived from that data, as they would have been for mitigation
pursuant to an ETP. The defendant will submit the annual results of the 0.35 mortality
monitoring data for any Listed Facility within three months of the end of the Mitigation
Year in which the monitoring occurred. The monitoring data will be submitted using the
USFWS Data Reporting Template; use of this Template will be accepted by all Service
Regions during the period of probation. USFWS may continue any scheduled Annual
Mitigation Meeting for up to 90 days after the receipt of such data in order to permit
sufficient time to analyze the data.

b.      For all Phase I, Phase II and Phase III facilities that implemented .35 mortality
monitoring for less than two full years prior to any Annual Mitigation Meeting, but which
implemented such monitoring for all or any portion of the most recently ended Mitigation
Year, the number of fatalities to be mitigated for the portion of such Mitigation Year
during which such monitoring occurred will be determined based on documented deaths
for which the cause is the direct or indirect result of a collision with a wind turbine of the
facility. For any portion of such Mitigation Year during which such monitoring did not
occur, mitigation will be based on "priors-only" modeling for Phase I and II facilities. For
Phase III facilities, the Parties stipulate, for the purposes of the Agreement and this EMP,
to a fatality rate of 2.3 eagles per year.

c.      Mitigation will be paid in the amount of $29,623 per dead eagle found, modeled
or stipulated to, as applicable. However, the Parties recognize that the annual eagle
mitigation ultimately determined to be required, either pursuant to two years of 0.35
mortality monitoring as described above, or in an ETP, for a Listed Facility, may be
lower than the number of eagles mitigated to that point under this EMP based on "priors-
only" modeling or stipulation, resulting in an initial overestimated number of eagles
mitigated. Conversely, the annual mitigation ultimately determined to be required after
two years of 0.35 mortality monitoring, or in an ETP, may be higher than the number of

12

eagles mitigated to that point under this EMP based on "priors-only" modeling or stipulation, resulting in an underestimated number of eagles mitigated. Any overestimated number of eagles mitigated for a Listed Facility that exceeds any underestimated number of eagles mitigated for a Listed Facility, will be credited toward future mitigation required at any Listed Facility under this EMP or under an ETP, as determined by defendant in its discretion.

26.   The compensatory mitigation requirements contained in an ETP issued to a Listed Facility take effect upon issuance and supersede the requirements in the prior paragraph as to the Listed Facility. The defendant is responsible for compensatory mitigation under this EMP as described above, from the date of the entry of the plea until the effective date of the ETP for each Listed Facility. Mitigation payments must be made within 90 days of the Annual Mitigation Meeting to a USFWS-approved compensatory mitigation program, or if no such program is available to an account controlled by the National Fish and Wildlife Foundation to be used for compensatory mitigation within the relevant eagle management units. Such payments must be documented within the report described in paragraph 27 of the Office of Probation and the Department.

**Consultations**

27.   The defendant, USFWS, and the Department will meet at least once every six months during the first two years of the probationary period, and once every 12 months thereafter, to discuss the defendant's progress in implementing the EMP and to address any issues or amendments in order to ensure the EMP's effectiveness. Every 12 months during the probation period, the defendant shall report in writing to the Court (via the U.S. Probation Office), USFWS, and the Department concerning the progress it has made implementing the EMP.

**Term of this EMP**

28.   This EMP shall terminate upon the later of the expiration of the five-year probation period, or extended non-prosecution term determined pursuant to the Agreement.

Notwithstanding anything in this EMP to the contrary, in no event do the Parties have any obligations under this EMP beyond the five-year probation period, unless the EMP is extended in writing upon mutual agreement pursuant to this paragraph and the Agreement. Upon USFWS's issuance of an ETP for any Listed Facility, the terms of that ETP will apply to such facility, and this EMP will immediately cease to apply to that Listed Facility. This EMP may be amended or modified only in writing, and only with the mutual agreement of the defendant and USFWS.